CONTINENTAL CASUALTY COMPANY *et al.*, Plaintiffs-Appellants, *v.* POLK BROTHERS, INC., Defendant-Appellee.

First District (1st Division)    No. 82—2203

Opinion filed November 21, 1983.—Rehearing denied January 17, 1984.

McGLOON, J., dissenting.

Clausen, Miller, Gorman, Caffrey & Witous, P.C., of Chicago (James T. Ferrini, Richard W. Strawbridge, and Lisa D. Marco, of counsel), for appellants.

Glen H. Kanwit and Karen P. Flynn, both of Hopkins & Sutter, of Chicago, for appellee.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

The present appeal arises out of an action brought by plaintiff insurance companies as subrogees of their insured, Rand Realty & Development Company (Rand). Plaintiffs' complaint alleged that the negligent conduct of defendant Polk Brothers, Inc. (Polk), caused a fire which ultimately resulted in the destruction of a building Rand had leased to Polk. The various insurers were thereby required to pay claims on fire insurance policies held by Rand, which they then sought to recover from Polk as damages. Plaintiffs appeal from an order granting Polk's motion for summary judgment.

On appeal, the insurance companies contend that under the lease agreement executed by Polk and Rand for the premises subsequently destroyed by fire, Rand clearly has a cause of action against the lessee Polk for damages to the building occasioned by Polk's negligence. Plaintiffs argue that as subrogees of Rand they should be permitted to pursue Rand's claim against Polk. Polk argues here, as it did below, that the lease agreement, the relationship between Polk and Rand as parent corporation and wholly owned subsidiary and the insurance policies procured by Polk and Rand all reveal an intent by the parties to the lease to look only to the insurance proceeds for indemnity against fire loss. Consequently, defendant contends that the insurance companies have no subrogation claim against Polk and the trial court properly granted its motion for summary judgment. After reviewing these competing contentions and the record below, we find the trial court properly granted Polk's motion for summary judgment, and affirm.

It is axiomatic that for a right of subrogation to exist, the subro-

gor must possess a right which he could enforce against a third party and that the subrogee must seek to enforce the subrogor's right. (*American National Bank & Trust Co. v. Weyerhaeuser Co.* (7th Cir. 1982), 692 F.2d 455.) The subrogee can have no greater rights than the subrogor and can enforce only such rights as the subrogor could enforce against the third party. (*William Aupperle & Sons, Inc. v. American Indemnity Co.* (1979), 75 Ill. App. 3d 722, 394 N.E.2d 725.) Thus, it is commonly stated that the subrogee (here the insurers) must step into the shoes of or be substituted for the subrogor (here Rand). (*London & Lancashire Indemnity Co. of America v. Tindall* (1941), 377 Ill. 308, 36 N.E.2d 334.) From the foregoing, it is clear that if the lease agreement executed by Rand and Polk exculpates the lessee Polk from liability for fire loss due to its own negligence, then the subrogee insurance companies will have no right of action against Polk.

Plaintiffs rely primarily on the yield-back, waiver of claims, and untenantability provisions contained in the lease to support their contention that a right of subrogation exists against Polk. The yield-back provision provides in relevant part:

"9. *** At the termination of this lease by lapse of time or otherwise, Lessee shall return the premises and all equipment and fixtures therein in as good condition as when Lessee took possession, ordinary wear and tear excepted, failing which Lessor may restore the premises, equipment and fixtures to such condition and Lessee shall pay the cost thereof upon request."

The waiver of claims provision requires the lessee, Polk, to waive all claims against the lessor for damages to person or property sustained by lessee or any other occupant of the building. The paragraph further provides:

"6. *** If any such damage, whether to the demised premises or to the building or any part thereof, or whether to Lessor or to other tenants in the building, result from any act or neglect of Lessee, Lessor may, at Lessor's option, repair such damage and Lessee shall upon demand by Lessor, reimburse Lessor forthwith for the total cost of such repairs. Lessee shall not be liable for any damage caused by its act or neglect if Lessor or a tenant has recovered the full amount of the damage from insurance and the insurance company has waived in writing its right of subrogation against Lessee."

Paragraph 13 of the lease agreement is the only provision in the lease dealing specifically with damage by fire and provides in relevant part:

"UNTENANTABILITY. If the premises or the Building are made *wholly untenantable* by fire or other casualty, Lessor may elect (a) to terminate this lease as of the date of the fire or casualty by notice to Lessee within thirty days after that date, or (b) to repair, restore or rehabilitate the Building or the premises *at Lessor's expense.* \*\*\* If the demised premises shall be *partially damaged* by fire or other casualty without the fault or neglect of Lessee, Lessee's servants, employees, agents, visitors or licensees, the premises shall be repaired, restored or rehabilitated by and at the expense of Lessor, \*\*\*." (Emphasis added.)

In construing these lease provisions our primary objective is to ascertain and give effect to the intent of the parties (*Hartwig Transit, Inc. v. Menolascino* (1983), 113 Ill. App. 3d 165, 446 N.E.2d 1193) through a consideration of the instrument as a whole (*One Hundred South Wacker Drive, Inc. v. Szabo Food Service, Inc.* (1975), 60 Ill. 2d 312, 326 N.E.2d 400). That intent must be ascertained, if possible, from the language of the lease and the words should be given their common and generally accepted meaning. (*Hartwig Transit, Inc. v. Menolascino* (1983), 113 Ill. App. 3d 165, 168.) However, where the language is ambiguous, evidence such as the position of the parties, the surrounding circumstances existing at the time of execution and the parties' subsequent conduct may be considered in order to explain language susceptible to more than one meaning. *Hartwig Transit, Inc. v. Menolascino* (1983), 113 Ill. App. 3d 165, 168; *American National Bank & Trust Co. v. Lembessis* (1969), 116 Ill. App. 2d 5, 11, 253 N.E.2d 126.

■ Applying the above cited rules of construction, we must reject plaintiffs' contention that the terms of the lease unambiguously manifest the intent of Rand and Polk to hold Polk liable for the negligent destruction by fire of the demised premises. Both the yield-back provision contained in paragraph 9 and the waiver of claims provision of paragraph 6 give the Lessor, Rand, the right to be reimbursed for repairs it makes to the leased premises under certain circumstances, particularly where the repairs have been necessitated by the lessee's negligence. As such, these provisions cut in plaintiffs' favor inasmuch as they demonstrate an intent to hold Polk liable for some types of damage to the building. However, the language of paragraph 6 is of a general character referring to "any damage" caused by lessee's negligence. Similarly, the yield-back clause would appear to impose a general duty to return the premises in good condition excepting only ordinary wear and tear. Neither paragraph makes reference to

reimbursement for damages caused by fire, whereas paragraph 13 specifically refers to this eventuality and should be determinative on the issue of the parties' intent. This approach is in accord with the well-settled rule of construction that where a document contains both general and specific provisions relating to the same subject, the specific provision is controlling. *Gordon v. Dolin* (1982), 105 Ill. App. 3d 319, 434 N.E.2d 341.

Paragraph 13 clearly differentiates between fire damage rendering the building wholly untenantable (as occurred here) and partial damage by fire. In the former case, the lessor has the option of terminating the lease or repairing, restoring or rehabilitating the premises at the lessor's expense. In the latter case, the lessor's obligation to repair the premises only arises where the fire occurs "without the fault or neglect of the lessee." The partial damage provision is clearly inapplicable to the case at bar and plaintiffs' reliance thereon is misplaced—here, the building was totally destroyed by fire. Under these circumstances, the language of the lease does not condition lessor's duty to repair at its own expense on the lessee being free from negligence as in the case of partial damage to the premises. Furthermore, there is no provision for the lessor to recoup the cost of such repairs as appears in other sections of the lease. Rather, paragraph 13 unequivocally requires the lessor to bear the entire cost of such repairs where the premises have been rendered wholly untenantable by fire.

Since Rand agreed to repair the building at its own expense if the building was totally destroyed by fire, it is clear that the parties contemplated Rand would obtain insurance to protect against this eventuality. This construction is bolstered by provisions contained in paragraph 11 of the lease wherein Polk covenanted not to make any use of the premises which would invalidate or increase the premium cost of insurance and to pay Rand for any such increases occasioned by Polk's use of the premises. Obviously, any obligation to pay the lessor for premium increases would pertain only to insurance which the lessor would maintain. Our supreme court has construed a similar lease provision requiring the lessee to pay increases in insurance premiums caused by lessee in *Stein v. Yarnall-Todd Chevrolet, Inc.* (1968), 41 Ill. 2d 32, 37, 241 N.E.2d 439. There, the court stated:

> " 'Clearly under this section of the lease it was contemplated that the lessor would carry insurance on the property *and look to the insurance for compensation for any loss by fire.* If the parties had intended otherwise, there would have been no reason for such provision.' *United States Fire Ins. Co. v. Phil-Mar Corporation* (1956), 166 Ohio St. 85, 89, 139 N.E.2d 330, 333.''

Faced with a situation in which the lessor implicitly agrees to provide fire insurance, the court in *Stein* further recognized the basic absurdity of also placing a duty on the tenant, who in effect paid for the landlord's insurance through rental payments, to seek a separate policy to protect against its own negligence. More specifically, the court stated:

"It would be a tortured construction, indeed, to say that under the lease here it was proposed that the lessor would procure fire insurance to cover fire risks save those which might be attributable to the negligence of the lessee or its employees. Under such a construction the lessee, to protect itself, then would seek an unusual, if not unique, policy to cover the risk of its own negligence, but nothing more. The only reasonable conclusion we can draw is that the parties intended, judging by their entire expression in the lease, that the lessors were to procure fire insurance and were to look to it to protect them from loss by fire, including fires which might be caused by the lessee's negligence." 41 Ill. 2d 32, 38.

Plaintiffs argue that an express exculpatory provision in the lease is required if the lessee is to be exonerated for its negligently caused fires. Our case law is to the contrary. In *Cerny-Pickas & Co. v. C.R. Jahn Co.* (1955), 7 Ill. 2d 393, 396, 131 N.E.2d 100, our supreme court held:

"The argument most strongly urged against exoneration of the lessee is that the lease does not in so many words provide that the lessee be free from liability for fires resulting from its own negligence. Of course, if the lease contained such an express provision, that would be the end of the matter. But because the contingency was not covered by express language, it does not follow that the instrument may not, when all of its provisions are considered, show that the parties themselves intended that the lessee should not be liable. That determination is to be made upon a consideration of the instrument as a whole. [Citations.]"

Accord, *One Hundred South Wacker Drive, Inc. v. Szabo Food Service, Inc.* (1975), 60 Ill. 2d 312, 314; *Stein v. Yarnall-Todd Chevrolet, Inc.* (1968), 41 Ill. 2d 32, 35.

Plaintiffs further argue that in every case in which a lease has been construed to exculpate a lessee for fires caused by lessee's negligence, fire damage was specifically exempted in the yield-back clause requiring lessee to return the premises in as good condition as when lessee took possession. (*One Hundred South Wacker Drive, Inc. v.*

*Szabo Food Service, Inc.* (1975), 60 Ill. 2d 312, 314 ("ordinary wear and loss or damage by fire or other casualty *** excepted"); *Stein v. Yarnall-Todd Chevrolet, Inc.* (1968), 41 Ill. 2d 32, 34 ("ordinary wear and tear or damage by fire or other casualty beyond lessee's control excepted"); *Cerny-Pickas & Co. v. C.R. Jahn Co.* (1955), 7 Ill. 2d 393, 395 ("loss by fire and ordinary wear excepted").) Plaintiffs contend that since the present yield-back provision does not specifically except loss by fire from the obligation of Polk to return the premises in good condition, the above cited cases are not controlling. We find plaintiffs' contention to be without merit. While the yield-back clause of a lease is an important indication of the parties' intent, failure to except fire damage therein merely raises ambiguity with respect to that intent. The proper construction to be given a lease is to be determined from the instrument as a whole. (*One Hundred South Wacker Drive, Inc. v. Szabo Food Service, Inc.* (1975), 60 Ill. 2d 312, 314; *Stein v. Yarnall-Todd Chevrolet, Inc.* (1968), 41 Ill. 2d 32, 39; *Cerny-Pickas & Co. v. C.R. Jahn Co.* (1955), 7 Ill. 2d 393, 396.) The yield-back provision in the *Stein* case is particularly instructive on this point since there only damage by fire "beyond lessee's control" was excepted, strongly indicating that fires due to lessee's negligence were not to be exonerated. The *Stein* court rejected this construction and construed the yield-back clause in relation to another lease provision requiring lessee to pay for increases in insurance premiums caused by lessee as evincing an intent to exculpate the lessee from liability and look only to the insurance proceeds for indemnification. Furthermore, plaintiffs' argument ignores a recent appellate court decision where the court found that the lease terms exculpated lessee from liability even though the yield-back provision was virtually identical to the one in the case at bar in that the clause did not specifically exempt damage by fire. *Windsor at Seven Oaks v. Kelly* (1983), 113 Ill. App. 3d 978, 979, 448 N.E.2d 251 ("Lessee will immediately yield up the Apartment to the Lessor in as good condition as when same was entered upon by Lessee, ordinary wear and tear excepted").

◼ Our review of the above-cited cases dealing with the issue of lessee liability for fire damage reveals that the key factor in determining whether the parties intended to exculpate lessee negligence is the allocation of insurance burdens as evidenced by the terms of the lease. Where the lease terms either expressly or impliedly indicate that the lessor is to obtain fire insurance, the lessee will normally not be held liable for fire damage caused by its own negligence unless the parties' intent is clearly to the contrary. This construction will give effect to the probable intent of the parties that the lessor is to look to

the insurance he has agreed to procure for indemnification from fire loss. To hold otherwise would require both lessor and lessee to obtain fire insurance—lessee for fires caused by his own negligence and lessor for all other fires. As we have previously noted, such a peculiar insurance arrangement is not in accord with normal underwriting practices existent in the insurance industry today where fire insurance policies are routinely written to cover all fire damage, even if caused by the insured's reckless or negligent conduct. Nor are we convinced that the right of the lessor to underinsure the premises or the position of the insurers as subrogees requires a contrary result. As the court noted in *Stein*:

> " 'If the lessor *** chose to carry insurance for less than the full value of the property, any detriment so resulting to it is due to its own fault. We need have no compunction here about the position of the insurers as subrogees. Fire insurers expect to pay fire losses for negligent fires and their rates are calculated upon that basis; indeed, we may well assume that a great majority of fires are caused by someone's negligence in a greater or lesser degree.' " *Stein v. Yarnall-Todd Chevrolet, Inc.* (1968), 41 Ill. 2d 32, 37-38.

The accuracy of the court's observation in *Stein* with regard to the position of the insurers as subrogees is borne out by testimony elicited in the case at bar from the vice-president of the insurance agency which calculated the insurance premiums and wrote the policies in question. His unrefuted testimony indicated that the coverage insured against all direct loss caused by fire, including fire caused by the negligent or reckless conduct of the insured and further that the insurance premiums would have been the same whether Polk had been named as a co-insured on the policy or not. This being the case, we are forced to conclude that the premiums were set without reference to a possible subrogation claim against the lessee as no additional cost would have been incurred by including Polk as a named insured thereby barring any possible subrogation claim against the lessee. Refusing a subrogation claim based on the terms of the lease will work no hardship on the insurers as no additional risk is being saddled upon them.

■ After reviewing the terms of the lease in light of the applicable case law we come to the following conclusions based only upon the language contained therein. We find the lease terms strongly indicate that the parties thereto never intended to hold Polk liable for fires caused by Polk's negligence. Clearly, under paragraphs 13 and 11, the parties contemplated that Rand would obtain insurance to protect it-

self against the total destruction of the building by fire and that Rand would look only to the insurance proceeds for indemnification. Consequently, Rand has given up all right of recovery against the lessee, Polk, and the derivative rights of plaintiffs as subrogees are nonexistent. To the extent paragraphs 6 and 9 evince a contrary intent, ambiguity on this issue may be said to exist. However, a review of the extrinsic evidence properly considered by the court below unequivocally indicates that any ambiguity was correctly resolved in defendant's favor.

The corporate structure of Polk and Rand and the relationship of the two corporations is highly probative on the issue of their intent. Polk is a close corporation solely owned by three brothers, Sol, Sam and Morris Polk and their sister Goldie Luftig. Sol is the president of Polk, Morris the vice-president and Sam the treasurer. The brothers have held these positions since the incorporation of Polk in 1935. Rand is a wholly owned subsidiary of Polk in the business of owning, developing and leasing properties primarily to Polk or one of Polk's other wholly owned subsidiaries. Since Rand was incorporated, the officers of Rand have been the same as the officers of Polk. The lease was prepared by an attorney that serves in that capacity for all the Polk companies and was a form lease containing certain minor revisions. Morris Polk signed the lease on behalf of Rand, and Sol Polk signed the lease on behalf of Polk. There were no negotiations over the terms of the lease nor any discussion that Rand, the lessor, had retained the right to recover against the lessee, Polk. Given the close relationship of the parties, this possibility was apparently not contemplated. Rand obtained fire and casualty insurance on the building with Polk obtaining similar insurance on the contents.

Viewing this extrinsic evidence together with the applicable lease provisions, we find the construction urged by defendant inescapable. As paragraphs 13 and 11 indicate, Rand was to carry fire insurance on the leased premises and did in fact do so. More importantly, the closely held nature of the two corporations and their intimate parent-subsidiary relationship conclusively demonstrates that Rand never intended to hold Polk liable for fire damage due to Polk's negligence. A contrary construction would render the insurance obtained by Rand nugatory since the same business entity (Polk and its wholly owned subsidiaries) would end up bearing the loss that the insurance was initially obtained to cover. Such unreasonable consequences cannot represent the intent of Polk and Rand when they executed the lease.

■ Although a summary judgment is a drastic remedy to be used with caution, its use is to be encouraged in the proper case. (*Tatelman*

*v. Tatelman* (1975), 25 Ill. App. 3d 678, 323 N.E.2d 821, *appeal denied* (1975), 58 Ill. 2d 599.) We find the trial court properly granted Polk's motion for summary judgment where the lease terms and the undisputed extrinsic evidence clearly demonstrated that no triable issue of fact existed with respect to whether Polk and Rand intended to exculpate the lessee, Polk, from liability.

For the foregoing reasons, the judgment of the trial court is affirmed.

CAMPBELL, J., concurs.

JUSTICE McGLOON, dissenting:

I respectfully dissent from the decision of my esteemed colleagues because I believe that it is, in essence, a revision of the contract between the parties. Rather, I find that the parties agreed to hold Polk liable for damage to the premises caused by its negligence.

The only statement in the majority opinion with which I can agree is that all provisions of the lease must be considered as a whole to determine the intent of the parties. (*One Hundred South Wacker Drive, Inc. v. Szabo Food Service, Inc.* (1975), 60 Ill. 2d 312, 326 N.E.2d 400; *Stein v. Yarnall-Todd Chevrolet, Inc.* (1968), 41 Ill. 2d 32, 241 N.E.2d 439; *Cerny-Pickas & Co. v. C.R. Jahn Co.* (1955), 7 Ill. 2d 393, 131 N.E.2d 100.) I would add, however, that the terms of the lease should be construed against defendant Polk because Polk's attorney prepared the lease. *Windsor at Seven Oaks v. Kelly* (1983), 113 Ill. App. 3d 978, 448 N.E.2d 251.

Paragraph 9, the yield-back clause of the lease, is particularly relevant. This paragraph provides in part:

> "\*\*\* At the termination of this lease by lapse of time or otherwise, Lessee shall return the premises and all equipment and fixtures therein in as good condition as when Lessee took possession, ordinary wear and tear excepted, failing which the Lessor may restore the premises, equipment and fixtures to such condition and Lessee shall pay the cost thereof upon request."

Conspicuously absent from this clause is an exclusion for loss by fire caused either by the lessee's negligence or otherwise. Under common law, a lessee was liable for damage to leased premises caused by his own negligence. (*Ford v. Jennings* (1979), 70 Ill. App. 3d 219, 387 N.E.2d 1125.) Unless the yield-back clause exempts the lessee from such liability, it does no more than restate the lessee's common law obligation. *Cerny-Pickas & Co. v. C.R. Jahn Co.* (1955), 7 Ill. 2d 393,

397, 131 N.E.2d 100, 103.

Thus, I disagree with my colleagues' statement that the failure to exempt fire damage in the yield-back clause merely raises an ambiguity with respect to intent to hold the lessee liable for its negligence. Rather, the absence of exculpatory language raises the inference that the parties intended to hold the lessee liable where the lessee caused the loss to occur. Indeed a similar inference was drawn in *Englehardt v. Triple X Chemical Laboratories, Inc.* (1977), 53 Ill. App. 3d 926, 369 N.E.2d 67, *appeal denied* (1978), 67 Ill. 2d 591, wherein the yield-back clause excepted only loss by fire or other casualty not caused by the lessee.

The cases relied on by the majority interpreted leases in which the yield-back clauses excluded loss by fire. In *Cerny-Pickas* and *One Hundred South Wacker Drive,* loss by fire was excepted. Again in *Stein,* loss by fire or other casualty beyond the lessee's control was excepted. Here, the yield-back clause did not state such exclusion. Admittedly, the lease contains some provisions similar to those examined in *Stein* to determine the parties' intent. Here, Rand was obligated to procure insurance on the building and Polk was required to insure the contents. Also Polk covenanted not to use the premises in any manner which would invalidate the insurance or increase the premiums. But other provisions of the lease between Polk and Rand distinguish this case from *Stein* and when read together with all the lease provisions, indicate that the parties intended to hold the lessee liable for its negligence.

As stated by the majority, paragraph 6 requires Polk to waive claims against the lessor for damage sustained by the lessee or any occupant of the building. However, it further provides:

"This Section 6 shall apply especially, *but not exclusively*, to the flooding of basements or other sub-surface areas, and to damage caused by refrigerators, sprinkling devices, air-conditioning apparatus, water, snow, frost, steam, excessive heat or cold, falling plaster, broken glass, sewage, gas, odors or noise, or the bursting or leaking of pipes or plumbing fixtures, and shall apply *** whether such damage be caused or result from any thing or circumstance above mentioned or referred to, or any other thing or circumstance *whether of a like nature or of a wholly different nature. If any such damage*, whether to the demised premises or to the Building or any part thereof, or whether to Lessor or to other tenants in the Building, *result from any act of neglect of Lessee, Lessor may*, at Lessor's option, *repair such damage and Lessee shall, upon demand by*

*Lessor, reimburse Lessor forthwith for the total cost of such re-*
*pairs.* Lessee shall not be liable for any damage caused by its
act or neglect if Lessor or a tenant has recovered the full
amount of the damage from insurance and the insurance com-
pany has waived in writing its right of subrogation against Les-
see." (Emphasis added.)

Clearly, this paragraph contemplates holding the lessee liable for dam-
age to or destruction of the premises by perils specified therein and
caused by the tenant's neglect. Even in *One Hundred South Wacker
Drive,* the court held that a clause virtually identical to paragraph 6
caused the tenant to assume such liability. Here, Polk also agreed to
be held liable for damage by perils of a wholly different nature result-
ing from its neglect. The possibilities of holding the lessee liable for
its negligent destruction of the premises and of incurring such liability
by way of a subrogation action are recognized and agreed to herein.

Contrary to the opinion of my colleagues, I would also find that
paragraph 13 evidences an intent to hold the lessee liable for fire
damage caused by its neglect. This paragraph provides in part:

"If the premises or the Building are made wholly untenantable
by fire or other casualty, Lessor may elect (a) to terminate this
lease as of the date of the fire or casualty by notice to Lessee
within thirty days after that date, or (b) to repair, restore or
rehabilitate the Building or the premises at Lessor's expense
***. If the demised premises shall be partially damaged by fire
or other casualty without the fault or neglect of Lessee, Les-
see's servants, employees, agents, visitors or licensees, the
premises shall be repaired, restored or rehabilitated by and at
the expense of Lessor. ***"

Beginning with the partial damage provision, it is clear that the lessor
is obligated to repair only if the damage was not caused by the lessee.
Granted, this clause is not the specific one applicable to this case
since the premises were totally destroyed by fire. However, it is
probative of the parties' intent and refutes the majority's conclusion
that Rand intended to look solely to insurance for reimbursement.

Regarding the total destruction provision, I disagree with the ma-
jority's holding that this clause unequivocally requires Rand to bear
the entire cost of repairs where the building has been rendered unten-
antable by fire. A reading of all the language in this clause indicates
that Rand could either terminate the lease or repair the premises at
its own expense. The majority ignored the former option in reaching
its conclusion and thus the clause is not as determinative of the par-
ties' intent as the majority so holds. If in fact Rand elected to termi-

nate the lease, the lessee would be required, under the yield-back clause, to return the premises in good condition. The yield-back clause expressly requires the lessee to do so upon "termination of the lease by lapse of time *or otherwise.*" (Emphasis added.) As noted above, the yield-back clause does not exclude loss by fire and thereby evidences the parties' intent to hold the lessee liable for negligent destruction of the premises. In my opinion the failure to consider all the language of the total destruction provision has substantially altered the agreement of the parties as expressed in the lease.

In summary, I find that the lease evidences the parties' intent to hold the lessee liable for its negligent destruction of or damage to the premises. This conclusion is inescapable considering the absence of exculpatory language in the yield-back clause and the language in paragraphs 6 and 13 which indicates that the lessee's negligence could be the basis for liability.

Other matters discussed by my colleagues and others apparent in the record also warrant discussion here. First, the majority noted the corporate relationship between Rand and Polk and concluded that if Polk were held liable, the same business entity would bear the loss which the insurance was obtained to recover. However, this conclusion is refuted by the well-established principle that affiliated corporations are separate and distinct entities. (*Main Bank v. Baker* (1981), 86 Ill. 2d 188, 427 N.E.2d 94.) The record shows that Rand has its own corporate charter, corporate minute books, books of accounts, and bank account. It purchases property with its own funds, holds title in its name, and takes tax deductions as owners of the realty. The same business entity would therefore not bear the loss and the inference opposite that drawn by the majority is equally sound. In fact, the close corporate relationship supports the equally plausible inference that the parties intended to retain the option of assigning the loss to the entity which would incur the more beneficial tax consequence.

An important lease provision not addressed by the majority is that concerning the procedure for releasing the lessee from liability. Paragraph 6, which specifically contemplates the insurance companys' right of subrogation, provides:

> "*** Lessee shall not be liable for any damage caused by its act or neglect if Lessor or a tenant has recovered the full amount of the damage from insurance and the insurance company has waived in writing its right of subrogation against Lessee."

Polk stipulated that Rand was not fully reimbursed for the damage and the record contains no written waivers by plaintiffs. Rather, Sa-

muel Polk, as president of Rand, signed subrogation receipts which expressly subrogated the insurance companies to all claims which Rand may have had against any person or corporation liable for the loss.

Defendant argues in its brief that clause D of the insurance policy eliminated the need for a written waiver. Clause "D" provides:

> "It is hereby stipulated that this insurance shall not be invalidated should the insured waive in writing prior to loss any and all rights or recovery against any party for loss occurring to the property described herein."

While this clause may eliminate the need for a written waiver from the insurance company as required by the lease, it is not a substitute for a written waiver which, under the terms of clause "D", was to be executed prior to loss. The interpretation urged by Polk would only encourage collusion between insureds and tortfeasors. Furthermore, Polk's waiver argument cannot stand in view of the subrogation receipts which specifically warranted that Rand had not settled or released any party who may have been liable for the loss and would not do so without the consent of the insured.

Finally, I disagree with the majority's application of *Windsor at Seven Oaks v. Kelly* (1983), 113 Ill. App. 3d 978, 448 N.E.2d 251, wherein the court found the lessee was exempted from liability even though the yield-back clause was almost identical to that in the case at bar. *Windsor* involved the interpretation of a residential lease which, as a general rule, is interpreted in favor of the tenant. The lease in the case at bar is a commercial lease which was prepared by Polk and thus is subject to stricter construction against Polk. Furthermore, the lessee in *Windsor* had no contractual duty to repair the premises in case of fire. Under paragraphs 6, 9, and 13 of the lease in this case, Polk was not exempted from liability for fire damage caused by its neglect. Thus, *Windsor* is not controlling on this issue.

For the foregoing reasons, I would find that plaintiffs can properly state a cause of action against Polk because the lease indicates an intent to hold Polk liable for its negligence. I would reverse the judgment of the trial court and remand the cause for a trial on the merits.